Filed 7/23/19

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C086476 |
| Plaintiff and Respondent, | (Super. Ct. No. 17F4235) |
| v. | |
| HEAVEN LEANN TURNER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Shasta County, Adam B. Ryan, Judge. Affirmed as modified.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant, Heaven Leann Turner.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant, Michael Rafferty.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Kathleen A. McKenna and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I B through F and II of the Discussion.

1

Mary H. was attacked and robbed at home in the early hours of the morning. A jury found defendants Heaven Leann Turner and Michael Benjamin Rafferty guilty of first degree robbery and found Turner guilty of mayhem as well. Defendants respectively raise several arguments on appeal.

In the published portion of this opinion, we reject Turner's instructional error claims. Turner argues the trial court prejudicially erred in failing to instruct the jury sua sponte that the infliction of great bodily injury is a required element to prove mayhem and that, like the disfigurement theory of mayhem, permanent injury is required to prove mayhem under the "slit of the lip" theory. In the unpublished portion of this opinion, we further reject Turner's arguments that: (1) defense counsel was ineffective for failing to request a modification of the mayhem instruction; (2) the prosecutor committed prosecutorial error during closing argument; (3) the prosecutorial error and the instructional error cumulatively violated her due process rights; (4) her sentence violates Penal Code[1] section 654; and (5) the trial court erred in denying her request to admit her whole interview with a police officer under Evidence Code section 356. We affirm the judgment after amending it to correctly reflect a consecutive sentence of 16 months for the robbery conviction.

Also in the unpublished portion of this opinion, we reject Rafferty's contention that the trial court abused its discretion in denying his motion for mistrial and conclude he forfeited his joinder in Turner's arguments. We, however, remand for the trial court to consider exercising its discretion to strike Rafferty's five-year enhancement under section 667, subdivision (a).

---

[1] All further section references are to the Penal Code unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

Because of the nature of the issues raised on appeal, we provide only a brief summary of the facts in the light most favorable to the judgments here. (See *People v. Jennings* (2010) 50 Cal.4th 616, 638-639.) Any other facts pertinent to our disposition are contained in the discussion of defendants' contentions.

Mary H. bought a truck from Rafferty in October 2016. Rafferty asked for the truck back a few days later because Turner, his girlfriend, was upset about the sale; Mary refused to return it. Over the next couple of months, Rafferty and Turner made additional requests for return of the truck and Rafferty also asked Mary for money he believed she owed him for the sale. One such return request occurred when Rafferty and Turner confronted Mary at her storage unit. Turner wanted to fight Mary and made threats. Mary declined to fight Turner and said her daughter was on the way. Turner responded "she didn't give an eff whose kid was -- you know, was around. She was going to kick [Mary's] ass." It is unclear how the altercation was resolved.

The bad blood between Turner and Mary was not limited to the truck purchase. Turner and Mary were also "having issues" about Turner's relationship with Rafferty because Mary felt Turner was not "treating him right."

In the early morning of December 4, 2016, Mary woke up to a scratching sound on the locked door of her bedroom. A few minutes later, Rafferty and Turner entered the bedroom with Rafferty shining a flashlight in Mary's eyes. Mary got out of bed and was "panic[ked] to get out of the room" because she "didn't want to be pinned in [her] room." Mary, who was unarmed, pushed against Turner to leave, but Turner did not budge.

Turner pulled out a knife and cut Mary in the face. "She missed [Mary's] eye by an inch, and it went all the way down [her] upper lip and split [her] upper lip."[2] The cut

---

[2] The jury was shown photographs of Mary's injury taken on December 4, 2016.

3

"slit the front [of her lip] wide open." A police officer described it as a laceration starting on the left side of her nose, down her cheek, and across her upper lip that "flayed her lip open." Turner also broke Mary's front tooth and stabbed her in the left shoulder. Mary screamed for her roommate to help.

Turner yelled at Rafferty to grab the truck keys and other items from the bedroom. Rafferty did as he was told, but grabbed only Mary's backpack and her phone, accidentally leaving the keys behind. Turner and Rafferty then left.

Mary had to get "butterfly stitches" to her face. During her testimony before the jury, Mary explained that, although the injury had "healed very good," it left a visible scar on her lip and "if you look closely, there's a line on [her] face."[3] Mary also had to get the remaining part of her front tooth removed.

Turner was charged with first degree robbery, assault with a deadly weapon, and mayhem. She was also charged with great bodily injury allegations as to the robbery and assault with a deadly weapon charges. The jury found her guilty of mayhem and first degree robbery, but found her not guilty of assault with a deadly weapon. The jury further found not true the great bodily injury allegations. Rafferty was charged with and found guilty of first degree robbery.

---

[3] The prosecution introduced four photographs of Mary's injuries taken on December 19, 2016, approximately two weeks after the attack. One of the photographs shows a vertical scar on Mary's face from her nose to the bottom of her upper lip.

4

DISCUSSION

I

*Turner's Arguments*

A

*There Was No Instructional Error*

The trial court instructed the jury with a modified version of CALCRIM No. 801 describing the elements of mayhem, as follows: "Defendant HEAVEN LEANN TURNER is charged in Count 3 with mayhem. [¶] To prove that the defendant is guilty of this crime, the People must prove that the defendant unlawfully and maliciously: [¶] 1. Permanently disfigured someone; [¶] OR, [¶] 2. Slit someone's lip. [¶] AND [¶] 3. The Defendant did not act in self-defense. [¶] Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with unlawful intent to annoy or injure someone else. [¶] A disfiguring injury may be *permanent* even if it can be repaired by medical procedures."[4]

As we understand it, Turner essentially argues the trial court prejudicially erred by failing to instruct the jury sua sponte that: (1) great bodily injury is an element required to prove mayhem under either theory presented; and (2) like the disfigurement theory, permanent injury is an element required to prove mayhem under the slit of the lip theory. The People argue Turner waived the issue by failing to object to the instruction at trial. They further argue the instruction was sufficient because it tracked the statutory language of section 203 and no clarification or modification was requested.

We review the merits of the instructional error claim to determine whether the instruction was a correct statement of the law or affected Turner's substantial rights. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [failure to request clarifying and

---

[4]     The parties did not propose additional instructions or revisions to the court's proposed instructions and Turner did not object to the instruction as given.

5

amplifying instructional language does not preclude appellate review to determine whether an instruction was a correct statement of law]; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087 ["we may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection"].)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) The trial court "has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested." (*People v. Wade* (1959) 53 Cal.2d 322, 334.) Generally, "it is enough for the court to instruct [on the elements of a crime] in the language of the statute when the defendant fails to request an amplification thereof." (*People v. Failla* (1966) 64 Cal.2d 560, 565.) "Even if such an instruction 'cannot be commended as a full or clear exposition of the meaning of the section of the code, still it cannot be said that it was error for the court in giving the law to have conformed to the language of the code, and to have omitted what that code itself omits.' " (*People v. Reed* (1952) 38 Cal.2d 423, 430.)

" 'Where an instruction on a particular point or points as given by the court is correct as far as it goes, and the only valid objection, if any, to it is that it is deficient or inadequate by reason of its generality, indefiniteness, or incompleteness, if defendant desires additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions on such point or points, he must properly request the same, otherwise error cannot be predicated upon the failure to give such additional instruction.' " (*People v. Reed*, *supra*, 38 Cal.2d at p. 430.) "The defendant will not be heard to complain where he has failed to request an amplification of an instruction [given in the language of the statute]." (*Ibid*.)

Section 203 defines simple mayhem as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." The statute "generally prohibits six injurious acts against a person, three that specify a particular body part and three that do not: (1) dismembering or depriving a part of someone's body; (2) disabling or rendering useless a part of someone's body; (3) disfiguring someone; (4) cutting or disabling the tongue; (5) putting out an eye; and (6) slitting the nose, ear or lip." (*People v. Santana* (2013) 56 Cal.4th 999, 1003.)

"Mayhem, an older form of the word 'maim,' was at common law restricted to injuries that 'substantially reduced the victim's formidability in combat' [citation]; the rationale being to preserve the king's right to the military services of his subjects. Gradually, the crime evolved to include injuries that did not affect the victim's fighting ability. Our current mayhem statute is based upon the Coventry Act of 1670, which first broadened mayhem to include mere disfigurement. That statute imposed a sentence of death on any person who, with malice aforethought, 'cut out or disable[d] the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable[d] any limb or member of any other person.' " (*People v. Keenan* (1991) 227 Cal.App.3d 26, 33-34, fn. omitted.)

"Though section 203 contains 'verbal vestiges' of the common law and the Coventry Act of 1670, ' "the modern rationale of the crime may be said to be the preservation of the natural completeness and normal appearance of the human face and body, and not, as originally, the preservation of the sovereign's right to the effective military assistance of his subjects." ' [Citations.] In other words, section 203 'protects the integrity of the victim's person.' " (*People v. Santana*, *supra*, 56 Cal.4th at p. 1004.)

"[S]ection 203 has remained unchanged since 1874, [but] cases have periodically clarified the statutory requirements for mayhem. For instance, with respect to a disabling injury, the victim's disability must be more than 'slight and temporary.' [Citation.]

7

Similarly, case law has 'grafted' on to section 203 the requirement that a disfiguring injury be permanent [citations]; in that regard, 'an injury may be considered legally permanent for purposes of mayhem despite the fact that cosmetic repair may be medically feasible' [citations]. And finally, as used in section 203, the word 'maliciously' 'imports an intent to vex, annoy, or injure another person, or an intent to do a wrongful act.' " (*People v. Santana*, *supra*, 56 Cal.4th at p. 1007.)

Turner posits *Pitts* is one such case law "graft," which requires the prosecution to prove great bodily injury as an element of mayhem under section 203 such that it must be included in the jury instruction. (Citing *People v. Pitts* (1990) 223 Cal.App.3d 1547.) We disagree.

In *Pitts,* the Court of Appeal considered whether a sentence for mayhem could properly be enhanced for inflicting great bodily injury under section 12022.7 in connection with the crime. (*People v. Pitts*, *supra*, 223 Cal.App.3d at pp. 1558-1559.) The court concluded the enhancement was impermissible because great bodily injury was an element of mayhem, and section 12022.7 did not apply when great bodily injury was an element of the underlying offense. (*Pitts*, at p. 1559; § 12022.7, subd. (g).)

In reaching that conclusion, the court rejected the People's argument that great bodily injury was not an element of mayhem because "a slight cut on the tongue or an infinitesimal slit on the ear or lip would come within the definition of mayhem but would not constitute a 'significant or substantial physical injury.' " (*People v. Pitts*, *supra*, 223 Cal.App.3d at p. 1559.) The court reasoned "that from the early common law to modern California law, mayhem has been considered a cruel and savage crime" and explained "the court's research amply supports [the] conclusion 'not every visible scarring wound can be said to constitute the felony crime of mayhem.' " (*Ibid.*) The *Pitts* court did not consider the adequacy of the mayhem jury instruction and whether great bodily injury is a necessary element of the offense in that context.

In 2006, CALCRIM No. 801 was revised to include *serious* bodily injury (not *great* bodily injury) as an element of mayhem, erroneously citing *Pitts* as authority for the addition. (*People v. Santana*, *supra*, 56 Cal.4th at pp. 1007-1008.) Seven years later, our Supreme Court considered "whether CALCRIM No. 801 properly include[d] [the serious bodily injury] requirement as a necessary clarification of section 203" and concluded it did not. (*Id.* at p. 1001.) Although the ultimate holding in *Santana* does not bear on the issue at hand, our Supreme Court's analysis is instructive.

Our Supreme Court explained that nothing in section 203 suggests the injurious acts of "*cutting* or disabling the tongue and *slitting* the nose, ear or lip" "must involve protracted loss or impairment of function, require extensive suturing, or amount to serious disfigurement." (*People v. Santana*, *supra*, 56 Cal.4th at p. 1010.) Thus, it "s[aw] no basis -- compelled either by case law or by the need to give jurors further guidance -- to superimpose a wholesale definition of 'serious bodily injury' . . . in the instruction. *By delineating the type of injuries that will suffice for mayhem, the Legislature itself established an injury's requisite level of seriousness in section 203, and when needed, subsequent cases have given further amplification*." (*Ibid*., italics added.)

We do not read *Pitts* to require a jury be instructed sua sponte that to find a defendant guilty of mayhem, it must find that he or she inflicted great bodily injury. We recognize *Pitts* held that great bodily injury is an "element" of mayhem (*People v. Pitts*, *supra*, 223 Cal.App.3d at pp. 1559-1560), but read *Pitts* to mean that the injuries specified in section 203 inherently constitute great bodily injury.

In enacting section 203, the Legislature was familiar with the common law concept of mayhem and knew the crime was considered a cruel and savage crime. (See *Goodman v. Superior Court* (1978) 84 Cal.App.3d 621, 623 ["in enacting section 203, the Legislature was familiar with the common law concept of mayhem, and that, when it couched its enactment in common law language, it intended to carry over such rules as were part of the common law crime into statutory form"]; *People v. Pitts*, *supra*, 223

9

Cal.App.3d at p. 1559 ["research discloses that from the early common law to modern California law, mayhem has been considered a cruel and savage crime"].) By defining "slitting the nose, ear or lip" as an injurious act sufficient to constitute mayhem, "the Legislature itself established [the injuries'] requisite level of seriousness in section 203" (*People v. Santana*, *supra*, 56 Cal.4th at p. 1010), finding those injuries sufficiently egregious to be considered a cruel and savage crime (*Pitts*, at p. 1559). The Legislature's policy decision in that regard squares with the modern rationale of mayhem to preserve the natural completeness and normal appearance of the human face and body. (*Santana*, at p. 1004.) We "see no basis -- compelled either by case law or by the need to give jurors further guidance -- to superimpose a [great bodily injury requirement] in the [mayhem] instruction." (*Id*. at p. 1010.)

To be clear, we conclude a trial court has no duty to sua sponte instruct the jury that the prosecution must prove great bodily injury as an element of mayhem. Nothing precludes a defendant, however, from requesting a pinpoint instruction clarifying the statutory requirements for mayhem given the specific facts of his or her case. If a defendant believes the injury at issue (e.g., a nick of a knife, slight cut, or infinitesimal slit) does not fall within the meaning of the injurious acts in section 203 or is not of the degree or nature sufficient to support a conviction for mayhem, he or she may request "additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions on such point or points." (*People v. Reed*, *supra*, 38 Cal.2d at p. 430.)

We also find Turner's permanent injury argument unsupported.[5] Turner argues *Goodman* stands for the proposition that "the cutting of a lip requiring several stitches, but which would heal without serious scarring, does not constitute mayhem because such

---

[5] The People do not address this argument.

10

an injury would not be considered to be permanent." (Citing *Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 621.) Thus, she posits, the instruction was misleading because it stated the disfigurement theory of mayhem required proof of permanent injury, but the slit of the lip theory did not, despite both theories arising from the same alleged act. *Goodman* does not stand for the proposition advanced.

In *Goodman*, the Court of Appeal considered "whether, as a matter of law, a five-inch wound inflicted on the victim's face, resulting in no functional impairment, but in probable permanent disfigurement, could support a charge of mayhem." (*Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 623.) In considering this issue, the court observed "not every visible scarring wound can be said to constitute the felony crime of mayhem" (*id.* at p. 625) and explained "[c]ases decided under the Coventry Act, and statutes like our own which obviously derive from it, have found mayhem *for disfigurement alone only where the injury is permanent*" (*id*. at p. 624, italics added). *Goodman* " 'grafted' on to section 203 the requirement that a disfiguring injury be permanent" (*People v. Santana*, *supra*, 56 Cal.4th at p. 1007), but that court did not consider nor decide that the three injurious acts to the specific body parts delineated in section 203 require a permanent injury to constitute mayhem.

We have found no California case, nor has Turner identified any, finding section 203 requires slitting the nose, ear or lip to be a permanent injury or to leave a permanent scar (as Turner suggests) for purposes of mayhem. The cases referencing the permanent injury graft on to section 203 have done so in the context of a disfiguring injury only. (See *People v. Hill* (1994) 23 Cal.App.4th 1566, 1571 ["[t]o prove mayhem based on a disfiguring injury, the injury must be permanent"]; *People v. Newble* (1981) 120 Cal.App.3d 444, 452-453 [in order to constitute mayhem under section 203, a disfiguring injury must be permanent]; *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347 [disfiguring injury must be permanent, as "such requirement was grafted to section 203 by case law"].)

11

It is true the *Goodman* court cited a New Mexico Supreme Court opinion and said mayhem would not include the cutting of a lip requiring stitches where the cut would heal without serious scarring. (*Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 624, citing *State v. Raulie* (1936) 40 N.M. 318 [59 P.2d 359].) When the facts of the New Mexico case are considered in context with this language, however, we read *Goodman*'s point to be that, while disfigurement may be caused by a cut in the lip, not every cut in the lip rises to the level of a disfigurement. (See *Raulie*, at p. 319 [punch in the mouth resulting in a cut lip during a "fist fight and brawl" that required some stitches but left no permanent injury to the lip was not evidence showing "witness ha[d] been maimed or disfigured" for purposes of mayhem]; see also Perkins & Boyce, Criminal Law (3d ed. 1982) Other Offenses Against the Person, ch. 2, § 8, pp. 241-242 & fn. 33 [disfigurement may be caused by a cut in the lip but a cut in the lip does not qualify as disfigurement unless it constitutes a permanent injury].)

We conclude the instruction was not misleading, as Turner contends, by including the case law "graft" in *Goodman* with respect to the permanent injury requirement for a disfigurement theory of mayhem while including only the statutory language for the slit of the lip theory. Whether a permanent injury requirement should be grafted on to a slit of the lip injury was not presented to the trial court and is not an issue for our consideration on appeal.

B

*Defense Counsel Was Not Ineffective For Failing*

*To Request An Amplification Of The Mayhem Instruction*

Turner appears to argue her counsel was ineffective for failing to request a pinpoint instruction clarifying "that great bodily injury and permanent injury are elements that the prosecution must prove beyond a reasonable doubt." The People do not address the argument.

12

To establish ineffective assistance of counsel, a defendant must prove that: (1) counsel's performance fell below the prevailing professional norms; and (2) that it is reasonably probable a more favorable outcome would have resulted but for counsel's failings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693]; *People v. Williams* (1997) 16 Cal.4th 153, 257.) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) Courts "accord great deference to the tactical decisions of trial counsel in order to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy . . . .' " (*In re Fields* (1990) 51 Cal.3d 1063, 1069.) Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland*, at p. 689 [80 L.Ed.2d at pp. 694-695].)

Assuming the requests for amplification to the jury instruction would have been meritorious (a point we need not consider), Turner fails to meet her heavy burden on appeal of establishing her counsel's conduct fell outside the range of reasonable professional assistance. The jury heard testimony from Mary and a police officer regarding the extent of the injuries inflicted on Mary, and the jury viewed photographs of Mary's lip taken on December 4, 2016, the day of the attack. The jury also viewed photographs of Mary's injuries taken approximately two weeks after the attack, one of which showed a vertical scar on Mary's face from her nose to the bottom of her top lip. And, Mary testified at trial (11 months after the attack) that although the injury had "healed very good," it left a visible scar on her lip and "if you look closely, there's a line on [her] face." The jury, of course, was able to discern for itself whether it believed

13

Mary's testimony regarding the visibility of the scars -- after all, it was observing her as she testified.

Defense counsel was never asked why he did not request amplifications to the mayhem instruction. The record suggests that defense counsel made a strategic decision to focus Turner's defense on the witnesses' credibility and Turner's self-defense argument. Given the testimonial and photographic evidence presented, defense counsel may have also reasonably concluded he could not present a credible argument to the jury that Mary's injury was not great bodily injury or permanent. Indeed, during his closing argument, defense counsel said: "And that's, again, why this becomes a case where -- it becomes a case where I'm not going to spend a ton of time on the elements of the charges. Because, again, if you believe [Mary] beyond a reasonable doubt, you can go ahead and convict my client, Ms. Turner. If you believe [Mary's] story beyond a reasonable doubt, then there was a residential robbery, then there was an assault with a deadly weapon, and there was a commission of mayhem and she did sustain an injury that was great bodily injury, you know, the special allegation in this case."

We accord deference to the tactical decisions of defense counsel. Turner has failed to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.

Turner argues the jury's not true findings on the great bodily injury special allegations demonstrate she would have received a more favorable outcome but for her counsel's failure to request the amplification for great bodily injury to the mayhem instruction. Not so. Juries frequently make inconsistent findings as a result of leniency, mercy, or confusion. (*People v. York* (1992) 11 Cal.App.4th 1506, 1510.) In any event, Turner did not meet the first prong of her burden. Thus, Turner has not shown that defense counsel violated her right to effective assistance of counsel in failing to request amplified language to the mayhem instruction.

14

C

*There Was No Prosecutorial Error[6]*

Turner argues the prosecutor committed error during closing argument by stating to the jury: "There's only one element of the [mayhem] offense here and it is that the defendant, [Turner], unlawfully and maliciously, permanently disfigured or split the lip of another person. [¶] [S]o you are asked on two theor[ies] here to decide mayhem. It could be just general permanent disfigurement, which is referring to the split in the lip or just the split in the lip is enough for this charge." She argues this statement was an incorrect statement of the law that relieved the prosecution of its burden to prove great bodily injury and permanent injury as essential elements of mayhem, and incorrectly stated a "split" in the lip was sufficient to prove mayhem rather than a "slit" of the lip.

Turner believes it is reasonably likely the outcome of her trial would have been more favorable absent the prosecutorial error because the jury found her not guilty of the assault with a deadly weapon charge and found the great bodily injury allegations not true. She further argues defense counsel was ineffective for failing to object to the prosecutor's statement because an admonition would have cured the harm. We find no prosecutorial error.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is

---

**6** We use the term prosecutorial error rather than prosecutorial misconduct. (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 ["[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error"].)

prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion -- and on the same ground -- the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "It is a fundamental principle that reversal for prosecutorial misconduct is not required unless the defendant can show that he has suffered prejudice." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 873.)

The prosecutor did not commit error by failing to identify great bodily injury and permanent injury as elements for the mayhem charge. His statement merely reiterated the elements of mayhem as laid out in the jury instruction, which we found sufficient *ante*. Although the prosecutor erred in using the phrase "splitting" of the lip rather than "slitting" of the lip, that alone does not amount to prosecutorial error. Mary's injuries were fully documented and presented to the jury through both testimonial and photographic evidence. And, Turner has made no showing that the prosecutor used " 'deceptive or reprehensible methods' " in an attempt to persuade the trial court or jury to find splitting rather than slitting of Mary's lip sufficient for the mayhem charge, or that the statement ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

Moreover, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least

16

damaging meaning from the prosecutor's statements.' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

It is undisputed the trial court instructed the jury with CALCRIM No. 220 regarding proof beyond a reasonable doubt, CALCRIM No. 222 instructed that the jury was to base its decision on the evidence presented and that counsel's arguments were not evidence, and CALCRIM No. 200 that the jury must follow the law as stated by the court, even if counsel's comments conflicted with the court's instructions. We presume the jury followed those instructions. (*People v. Charles* (2015) 61 Cal.4th 308, 324, fn. 8; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.) Turner points to nothing in the record indicating the jury understood or applied the prosecutor's statement in any improper or erroneous manner.

Because there was no prosecutorial error, Turner's trial counsel was not ineffective for failing to object to the prosecutor's closing argument.

D

*There Was No Cumulative Error*

Turner seeks reversal based on "[t]he cumulative effect of the prosecutorial error combined with the jury instructional error." "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Having rejected both of Turner's claims of error, "we discern no prejudice -- singly or cumulatively -- that warrants reversal." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 388.)

E

*The Trial Court's Section 654 Determination Is Supported By The Evidence*

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct. [Citations.] If, for example, a defendant suffers two convictions, punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then

17

stayed. [Citation.] Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences." (*People v. Deloza* (1998) 18 Cal.4th 585, 591-592.) The purpose of section 654 is to ensure a defendant's punishment will be commensurate with his or her culpability. (*People v. Perez* (1979) 23 Cal.3d 545, 550-551.)

The trial court sentenced Turner to eight years for the mayhem conviction, 14 months consecutive for the robbery conviction, and eight months consecutive for a conviction in a separate case (case No. 13F3928), for which Turner had been on probation. As to the two guilty verdicts in this case, the trial court explained: "The Court examining 654 would find that these crimes were not multiple crimes committed by a single act. The Court would find that they were multiple intents and objectives. The objective of the robbery was the taking of the purse or the keys. The objective of the mayhem was to harm the victim for fighting back. [¶] And the actual taking of the purse was done by Mr. Rafferty after Ms. Turner confronted the victim." The trial court also considered Mary to be a vulnerable victim.

Turner argues "[t]he trial court erred by imposing separate consecutive sentences for the robbery and mayhem convictions . . . because the alleged act of mayhem was committed to accomplish the robbery, when [Mary] resisted the robbery by pushing at [her]." Specifically, Turner argues the act of mayhem was incidental to the robbery because: (1) it was not a gratuitous act of violence committed against an unresisting victim; (2) it was not committed after the robbery had been completed; and (3) it was used to meet the force or fear element for robbery.

The People argue the trial court appropriately found the "knife attack was not merely incidental" to the robbery because the evidence showed that, before the robbery, Turner had been hostile toward Mary, there had been tension between the two arising from Turner's relationship with Rafferty, and Turner had challenged Mary to a fight. Further, the People argue, Turner and Rafferty had the situation under control before

18

Turner pulled out the knife, the robbery had already commenced when the act of mayhem occurred, and the violence toward Mary went far beyond what was reasonably necessary to commit the robbery.

" '[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] . . . [Citation.] If all the offenses were *incident to one objective*, the defendant may be punished for any *one* of such offenses but not for more than one.' [Citation.] 'If [a] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' [Citation.] The application of section 654, thus, 'turns on the *defendant's* objective in violating' multiple statutory provisions. [Citation.] Where the commission of one offense is merely ' "a means toward the objective of the commission of the other," ' section 654 prohibits separate punishments for the two offenses." (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1288.) Thus, "the fundamental inquiry is whether the two crimes constituted 'an indivisible transaction' and were 'incident to one objective.' " (*Id.* at p. 1290.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) We view the evidence favorably to support the judgment and presume every factual finding that could reasonably be deduced from the evidence. (*Id.* at pp. 1312-1313.)

The evidence[7] presented at trial supports the trial court's determination. First, there was no evidence of an intent to rob Mary until *after* the act of mayhem had occurred. Neither Rafferty nor Turner asked Mary for money, the keys to the truck, or any other property when they entered the bedroom. Turner yelled at Rafferty to grab the truck keys and other items from the bedroom only after she had cut Mary. Second, Turner had previously threatened physical violence against Mary, and Mary had, in response, indicated to Turner that she did not wish to fight her. The history between the parties may show motivation for gratuitous violence supporting the finding of two simultaneous intents for purposes of section 654. (See *People v. Cleveland* (2001) 87 Cal.App.4th 263, 272.)

Third, the act of mayhem was not essential to the robbery offense, as Turner claims. There were other acts of fear that satisfied the force or fear element required for the robbery conviction. Such acts included Turner and Rafferty breaking into Mary's locked bedroom in the early hours of the morning while she was asleep and unarmed, shining a flashlight in her eyes to further disorient her, and Turner's prior threat of physical violence. Indeed, Mary testified she was panicked when they entered the bedroom and she wanted to escape. Given that Turner had previously threatened physical violence against Mary, it is reasonable to infer Mary feared for her safety when Turner and Rafferty broke into her bedroom. Nothing in the record supports Turner's claim that Mary was resisting *the robbery* when she pushed Turner, or that she was resistant "to giving up the alleged subject of the robbery, the keys to the truck."

---

[7] Turner relies in significant part on comments the prosecutor made during closing argument to "demonstrate that the alleged act that constituted the force or fear for the robbery was the same act that constituted the mayhem and that the robbery was not complete until [Turner] allegedly cut [Mary's] face to counter her resistance to giving up the alleged subject of the robbery, the keys to the truck." We do not consider the prosecutor's comments; attorney arguments are not evidence. (*People v. Kiney* (2007) 151 Cal.App.4th 807, 815 ["[u]nsworn statements of counsel are not evidence"].)

Fourth, the slitting of Mary's lip was not essential to the commission of the robbery or the means by which the robbery was accomplished. It was a gratuitous, independent act of violence. When Mary pushed Turner, Turner did not budge. The reasonable inference is that Turner had neutralized the force asserted by Mary and had overcome Mary's resistance at that point; there was no evidence of any further potential resistance by Mary. Turner also knew that Mary had previously shied away from violence when Mary declined to fight her. The act of mayhem under these circumstances suggests a different and more sinister goal than the successful commission of a robbery. "We should not lose sight of the purpose underlying section 654, which is 'to insure that a defendant's punishment will be commensurate with his [or her] culpability.' " (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.) Based on the evidence, the trial court could reasonably find the act of mayhem was not a means toward the objective of the robbery so as to preclude multiple punishments under section 654. (*People v. Kurtenbach*, *supra*, 204 Cal.App.4th at p. 1288.)

The facts of this case differ from those in *Flowers*, upon which Turner relies. (*People v. Flowers* (1982) 132 Cal.App.3d 584.) In *Flowers*, the evidence showed "the whole purpose of the confrontation in the motel room was to commit a robbery" and, therefore, the sentence for the attendant assault offense had to be stayed because the robbery and assault were indivisible. (*Id.* at pp. 589, 590.) Here, there was evidence of an intent supporting mayhem separate from the intent to commit robbery, supporting the trial court's section 654 determination. While the act of mayhem may have been committed by Turner to facilitate the robbery, as Turner contends, the question before us is whether there is substantial evidence to support the trial court's determination; we do not reweigh the evidence.

Although not addressed by the parties, we note the oral pronouncement reflects a 14-month consecutive sentence for the robbery conviction whereas the abstract of judgment reflects a 16-month consecutive sentence. "Rendition of the judgment is

21

normally an oral pronouncement, and the abstract of judgment cannot add to, or modify, the judgment, but only purports to digest and summarize it." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 389.) Where, however, as here, the oral pronouncement amounts to an unauthorized sentence, we can correct it at any time. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249.) We, accordingly, modify the judgment to reflect a consecutive sentence of 16 months for the robbery conviction, as correctly provided in the abstract of judgment.

F

*The Trial Court Did Not Err Under Evidence Code Section 356*

Turner argues the trial court erred in denying her request to admit her whole interview with Redding Police Officer David Chapman after Officer Chapman testified Turner told him "she had just showered and changed her clothes" when he interviewed her on the day of the incident. We conclude the trial court did not err in finding the remainder of Turner's interview inadmissible under Evidence Code section 356.

During the interview, which was not admitted into evidence, Officer Chapman asked Turner whether she stabbed Mary and Turner responded, "[a]bsolutely not, she stabbed m- or she didn't stab me, but she cut me." Officer Chapman said, "I saw the scratches on you, I'm not seein' any blood though." Turner responded: "Um, I just got outta the shower, it's not real -- they're not real bad, I was -- it's just from me holdin' her, uh, it was my fault, it was from slappin' her fa- hands to her face." Officer Chapman tried to clarify: "So did you stab her?" Turner said she did not.

At trial, the prosecutor asked Officer Chapman whether he had an opportunity "to observe [Turner's] person and her body" on December 4, 2016. Officer Chapman said he did, and the prosecutor asked whether he saw anything of interest. Officer Chapman responded: "There were scratches on both of her forearms. She had also mentioned that she had just showered and changed her clothes."

22

Pertinent to this testimony, defense counsel later requested "to be able to question Officer Chapman about the fact that he questioned [Turner] at her home, and she denied having stabbed [Mary]. And, in fact, said she was attacked by [Mary]." This request was made, in part, to "not have the jury speculating about why [Turner] would have showered or changed her clothes." The judge asked how Officer Chapman's testimony at trial related to the possible introduction of Turner's whole interview. Defense counsel responded: "Well, I think they give the impression that Ms. Turner went home to clean up and somehow downplayed or minimized some kind of evidence that would have been useful to the cops in this case. And, I mean, I would submit that it's not a direct correlation but in conjunction there is potential for prejudice to Ms. Turner. And certainly, the fact that she came home and showered and changed, I think is the type of statement that a jury would run with unless it's placed in a broader context."

The judge was not convinced and explained the "just showered" comment "could be interpreted in ways that are both favorable and unfavorable to Ms. Turner. On one hand, did she come home to rinse off evidence of a crime? On the other hand, did she come home and act like anyone normally would and take a shower before she went to bed or take a shower when she got home?" The judge, accordingly, denied Turner's request to admit the additional statements from her interview with Officer Chapman.

Turner argues the trial court erred because her statements during the interview denying the attack on Mary and accusing Mary of attacking her instead were necessary to explain the "just showered" comment to prevent the jury from believing she had showered to get rid of evidence. She asserts the "just showered" comment was made in "response to Officer Chapman's accusation that [she] was lying about being attacked/cut because she had no fresh blood on her injuries" and, therefore, her account of the altercation with Mary needed to be admitted "so that the jury would understand the 'just showered' statement." The People argue the trial court acted well within in its discretion

23

in not admitting the interview because "[t]he jury did not need to hear any details explaining the shower or clothes process to understand it."

Evidence Code section 356 provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . . ; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he [or she] may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156.) "Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130.)

A trial court exercises its discretion when ruling on the admissibility of evidence under Evidence Code section 356, and we review such rulings for abuse of discretion. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

As noted, Evidence Code section 356 requires the admission of "the whole" of an out-of-court statement only "on the same subject" as the part which has already come in. The out-of-court statement that had already come in was Turner's statement to Officer Chapman that she had just showered.[8] The question, therefore, is whether the remainder of Turner's interview with Officer Chapman (which she sought to introduce) was "on the same subject" as her "just showered" out-of-court statement. We simply do not see, and

---

[8] Officer Chapman's testimony regarding the scratches on Turner's arms was based on his observations; the testimony did not relate an out-of-court statement by Turner.

Turner has not shown, how her version of the altercation with Mary concerned the same subject matter or had any bearing on or connection with the "just showered" statement to correct the alleged misleading impression that she showered to get rid of evidence.

Turner believes *Harris* supports her argument; it does not.[9] (*People v. Harris* (2005) 37 Cal.4th 310.) "In *Harris*, the defendant maintained that he and the attempted-murder victim were in business together selling drugs and gave an account of being shot at by strangers when he went to the victim's home to do a drug deal. Because the victim was unavailable for trial (he was later murdered in an unrelated incident), his preliminary hearing testimony was entered into evidence. The evidence included the victim's denial that he was a 'loan shark' and his description of himself as a businessman. The defendant impeached the victim's denial with evidence that, during a telephonic interview with an investigating officer after the attempted murder, the victim admitted he was a loan shark. Our Supreme Court held that the prosecution was entitled to present the entire context in which the victim made the admission that he was a loan shark, including the victim's explanation of the shooting, which he asserted arose out of his loaning money to the defendant, not a drug deal. 'The statements were admissible for the nonhearsay purpose of placing [the victim's] statements into context [under Evidence Code section 356].' " (*People v. Parrish*, *supra*, 152 Cal.App.4th at p. 274.)

The interview statements in *Harris* were admissible because the statements provided context as to why the victim admitted to being a loan shark -- he initiated that interview after learning that his fiancé and unborn child had been murdered to " 'set the record straight' and tell the police information regarding his shooting and the murder of [his fiancé]," which involved him lending money to the defendant. (*People v. Harris*, *supra*, 37 Cal.4th at pp. 322, 334.) The context of the loan shark admission was

---

[9]     The People do not address this case.

25

necessary to counteract the defendant's effort to impeach the victim's preliminary hearing testimony. The same is not true here.

The purported misimpression Turner asserts would have been countered by the remainder of her interview statements was that she took a shower to get rid of evidence. But, nothing in her interview with Officer Chapman sheds any light on *why* she took a shower. The question was never asked, and Turner never volunteered an explanation. Turner's account of the incident with Mary also would have done nothing to qualify or enlighten the jury's understanding of Turner's "just showered" comment. The statements Turner sought to introduce thus would not have served the purpose of Evidence Code section 356 -- that is "to avoid creating a misleading impression." (*People v. Samuels*, *supra*, 36 Cal.4th at p. 130.) Accordingly, the trial court did not abuse its discretion in denying Turner's request.[10]

II

*Rafferty's Arguments*

A

*The Trial Court Did Not Err In Denying The Motion For Mistrial*

During jury selection, the trial court engaged in voir dire of prospective alternate juror M. B. The court asked M. B. whether he knew anything about the defendants; M. B. responded Rafferty was "very familiar with [him], and [it was] probably because of [his] last employment." The court asked, "What was your last employment?" M. B. said, "CDC." The court asked counsel to approach and M. B. was excused from jury service.

---

**10** We note Turner had an opportunity to explain why she showered that morning when Turner testified on her own behalf at trial. She also had the opportunity to explain why she told Officer Chapman she had taken a shower. She did not provide an explanation to counter the purported misimpression of which she complains. Thus, for Turner to argue she was given "the Hobson's choice of foregoing her constitutional right to defend herself by allowing the jury to believe this prejudicial misimpression without challenge or giving up her constitutional right not to testify" appears to be disingenuous.

26

Rafferty's counsel later made a motion for mistrial and said: "With respect to the juror who -- I don't recall his name, but he was one of the last alternates [who] had blurted out that he had recognized and knew Mr. Rafferty from the CDC. I suppose -- on behalf of the record -- I was making a motion for mistrial. I believe it's not technically more substantive grounds for that, but it was somewhat of [a] gratuitous comment from that juror that I think is unnecessary indicating the basis of a relationship." The judge responded: "And my view of the comment was that it was really limited to just that I recognized him through CDC, meaning Mr. Rafferty only. I actually did hear some comments from some of the other jurors saying, what's CDC? Obviously there would be a number of different words that could constitute that abbreviation including the Center for Disease Control for all we know. But I think without more that was out there, I don't feel that a mistrial is warranted. [¶] At this point, I'm going to deny the motion."

Rafferty argues the trial court erred in denying his motion for mistrial because M. B.'s comment "clearly conveyed to the 12 sworn sitting jurors that M. B. knew [him] from [his] time as an inmate at the California Department of Corrections." We disagree.

" 'Denial of a motion for a mistrial is reviewed for abuse of discretion and should be granted "only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " ' [Citation.] ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " ' " (*People v. Tatum* (2016) 4 Cal.App.5th 1125, 1130.)

Rafferty equates M. B.'s brief "CDC" comment with the trial court's prejudicial comments in *Tatum*. In *Tatum*, "the trial court made extended remarks to prospective jurors, including six of those eventually empaneled, that she had had 'horrible experiences with plumbers,' and 'if I hear somebody is coming in, and I hear he's a plumber, I'm thinking, "God, he's not going to be telling the truth." ' The defense alibi

27

witness, Goolsby, was a plumbing contractor. Goulsby testified that Tatum was working for him on a plumbing jobsite the entire day on the date Tatum was alleged to have shot Lowe and Valentine. If the jury believed Goulsby, Tatum was not guilty. But six members of the jury had heard the trial court advise them *that the court herself would not believe a plumber who testified.* Goulsby's credibility was a central issue. The prosecutor directly challenged Goulsby's credibility on cross-examination, asking why he had not told a detective that Tatum was working for him on the day of the shooting. The prosecutor argued forcefully in closing that Goulsby was not credible and was lying to help his friend. The court's statement that plumbers who came into court were liars validated the prosecutor's argument, irreparably damaging Tatum's chance of receiving a fair trial. The comment by the court expressed the court's view on the credibility of Tatum's alibi in a trial where Tatum's alibi was his only defense." (*People v. Tatum*, *supra*, 4 Cal.App.5th at p. 1131, fn. omitted.)

We see absolutely no similarity between the trial court's prejudicial statements in *Tatum* and M. B.'s singular reference to the "CDC" here. The acronym was never explained and did not reveal any particular prior criminal conduct by Rafferty. It is, therefore, not clear, as Rafferty contends, that any juror knew what "CDC" meant. Indeed, the trial judge noted that some of the jurors said they did not know what "CDC" meant. There was no further discussion about how M. B. knew Rafferty from his employment at the "CDC" -- e.g., as an employee, as an inmate, or in some other capacity.

Rafferty suggests that jurors "could likely identify CDC, which controls a state-wide budget of $10.3 billion-dollar budget [*sic*] with responsibility for more than 130,000 inmates." (Fns. omitted.) This suggestion is pure speculation. Rafferty fails to convince us that the single obscure reference to "CDC" rendered his trial fundamentally unfair such that a mistrial was warranted.

28

B

*Remand For Reconsideration Of The Five-Year Enhancement Is Warranted*

Under the law that was in effect on the date of Rafferty's sentencing, a person convicted of a serious felony with a prior serious felony conviction was subject to a five-year enhancement. (Former § 667, subd. (a).) Thus, at the time Rafferty was sentenced, a trial court did not have discretion to strike the enhancement in the interests of justice. (Former § 1385, subd. (b).) On September 30, 2018, the Governor signed Senate Bill No. 1393, which amended sections 667 and 1385 to give the trial court the discretion to strike the serious felony enhancement in the interests of justice. (Stats. 2018, ch. 1013, § 2; §§ 1385, 667, subd. (a).)

Rafferty contends, and the People concede, that because his conviction is not yet final, the amendment to sections 667 and 1385 applies retroactively and makes him eligible for remand for resentencing and potential imposition of a reduced sentence. (See *In re Estrada* (1965) 63 Cal.2d 740, 748 [for a nonfinal conviction, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"]; see also *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) We agree.

C

*Rafferty Forfeited The Issues Raised In Turner's Opening Brief*

Rafferty "joins in all issues raised by [Turner] which may accrue to his benefit" and "specifically joins in the contention that the trial court prejudicially erred when it violated of [*sic*] the 'rule of completeness' of Evidence Code [section] 356 by failing to permit his codefendant's entire statement to come before the jury." He makes no attempt, however, to support his joinder with argument or citation to authority to explain why joinder is proper as to specific claims.

"Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the

29

specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground.  If a party's briefs do not provide legal argument and citation to authority on each point raised, ' "the court may treat it as [forfeited], and pass it without consideration." ' " (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 363.)  We treat Rafferty's joinder request as forfeited.

DISPOSITION

Turner's judgment is modified to reflect a consecutive sentence of 16 months for the robbery conviction.  As modified, Turner's judgment is affirmed.

As to Rafferty, the matter is remanded to the trial court to consider exercising its discretion in striking the five-year enhancement.  In all other respects, Rafferty's judgment is affirmed.

/s/
Robie, J.

We concur:

/s/
Blease, Acting P. J.

/s/
Duarte, J.

30