*1127 Opinion
JOHNSON, J.
—Vincent Anthony Tatum (Tatum) appeals from the judgment entered on his convictions of first degree murder and first degree attempted murder. Tatum asserts (among other claims) that the trial court erred in denying his motion for a mistrial. We agree, and we reverse.
BACKGROUND
Tatum and Devin Lowe (Lowe) grew up in the same neighborhood in south Los Angeles. Tatum lived on 119th Street, and Lowe lived on 115th Street. They had been friendly acquaintances for years, but beginning in March 2013, their relationship deteriorated; they had disagreements about “money,” and “all type[s] of things.” In the summer of 2013, Tatum warned Lowe to stay away from the neighborhood, and in a separate incident, Tatum brandished a weapon in front of Lowe.
On the morning of October 17, 2013, Lowe’s half brother Victor Valentine (Valentine) drove to Lowe’s home to pick up Lowe to go to the gym. As Lowe waited for Valentine to arrive, he saw Tatum “flying up and down the street” in his car. Valentine picked Lowe up shortly before 8:30 a.m., and when Valentine’s car reached the intersection of 120th and Avalon Streets, Tatum pulled his car alongside Valentine’s car and began verbally harassing Lowe and Valentine. According to Lowe, Tatum was angry. Valentine asked Tatum if he wanted to fight, and Tatum agreed, suggesting that they meet to fight on 121st Street. Valentine drove to 121st Street, where Lowe and Valentine encountered a friend, sitting on the hood of his car, parked next to the curb. Valentine parked, and he and Lowe exited the car and spoke with the friend.
Approximately five minutes later, Tatum drove down 121st Street, parked his car on the opposite side of the street from them, exited the vehicle, and walked across the street towards Valentine and Lowe. Tatum carried a gun, but Valentine and Lowe were unarmed. The three began arguing; Tatum demanded money and threatened to shoot them, stating that Lowe and Valentine should not be around the neighborhood. The brothers decided to leave and got into Valentine’s car. Tatum shot the back tire of the car and fired a second time, striking Lowe. Although Valentine attempted to drive away, his car struck another car and became inoperable. Tatum walked up to the car and resumed firing into the vehicle. He shot Lowe and Valentine multiple times. Valentine died as a result of his injuries.
Los Angeles County Sheriff’s deputies responded to the crime scene. Believing that Lowe would not survive his injuries, a deputy interviewed him *1128 at the scene and he identified Tatum as the shooter. Investigators recovered multiple bullet fragments and cartridge casings from the scene and the vehicle. The ballistics evidence showed that the shooter was “very close” to the car when he fired. Police arrested Tatum shortly thereafter.
An information charged Tatum with first degree murder (Pen. Code, § 187, subd. (a);[1] count 1), first degree attempted murder (§§ 187, subd. (a), 664; count 2) and firearm allegations. The information further alleged that Tatum had suffered prior seven felonies within the meaning of section 1203, subdivision (e)(4), one felony within the meaning of section 667.5, and one felony within the meaning of the “Three Strikes” law. Tatum pleaded not guilty.
The jury convicted Tatum of first degree premeditated and deliberate murder, first degree attempted murder, and found the firearm allegations true. The court sentenced Tatum to a total of 114 years in prison. Tatum filed a timely appeal.
DISCUSSION
1. Facts
On the first day of voir dire, the court informed the first group of prospective jurors that they would be judging the credibility of the witnesses and that they would receive instructions on how to assess a witness’s credibility. The court later elaborated: “The law says that you can’t prejudge anybody. You can’t automatically give somebody more credibility or automatically give them less credibility before they even take the stand. And I always use this example—and I’m sorry if somebody here is a plumber, but I’ve had horrible experiences with plumbers. I’ve just had horrible—during remodels or whatever, just horrible experiences. So if I hear somebody is coming in, and I hear he’s a plumber, I’m thinking, ‘God, he’s not going to be telling the truth.’ So obviously I have already prejudged that person, and I wouldn’t be able to be fair. Everyone who takes the stand, you start at the same position. Now, once they get up on the stand and they testify, that’s when you start to use your skills about judging credibility.” The court clarified that once a witness begins testifying, “you can start to evaluate. But you can’t do it beforehand.”
Tatum’s counsel moved for a mistrial based on the court’s comments about plumbers. Defense counsel explained that “when the court was using the example about the plumber, and you said that you would not believe any *1129 plumber if he came in to testify, our alibi witness is a plumber.” The court denied the mistrial motion, stating, ‘T could certainly tell the jury that was by way of example, and that’s a personal thing.” The court also asked Tatum’s counsel if she wanted the potential jurors admonished regarding the plumber. Tatum’s counsel declined the offer, “I’m just going to make a tactical decision to leave it alone. I’d rather not accentuate it in their minds.”
The next day, another group of potential jurors was brought in for voir dire. The court repeated the instructions concerning how to evaluate a witness’s credibility but omitted her personal anecdote about plumbers.[2] At the outset of the trial, the court instructed the jury to ‘“[kjeep an open mind throughout the trial. Do not make up your mind about the verdict or any issue until after you have discussed the case with the other jurors during deliberations. Do not take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be.” The court also told the jury that ‘“[y]ou alone must judge the credibility or believability of the witnesses” and listed various factors to consider in making that determination. The court further instructed that ‘“[y]ou must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness’s testimony. Consider the testimony of each witness and decide how much of it you believe.”
Tatum’s alibi witness was Major Lee Goulsby (Goulsby), a plumbing contractor who had owned Speedy Plumbing 2000 for 10 years. Goulsby testified that he was friends with Tatum, and called him if he needed man power: ‘“he’s one of my first men that I call.” Goulsby testified that Tatum was working for him at a job involving a lot of demolition on October 17, 2013, the day Valentine was killed and Lowe was shot. Tatum was at the office when Goulsby arrived at 7:30 a.m. or 8:00 a.m. Goulsby drove him to the job around 9:00 a.m., and Tatum was at the site the entire day. Asked, ‘“[wjould you lie for [Tatum] today because you don’t want to see him get in trouble?,” Goulsby replied, ‘“Never.” On cross-examination, Goulsby testified that when a detective called to tell Goulsby that Tatum was wanted for murder, Goulsby hung up the phone without telling the detective that Tatum had been with him on the day Valentine was shot, and did not call Tatum to tell him he was wanted for murder. The prosecutor asked Goulsby if he already knew his friend (Tatum) was wanted, because he had been with him after the shootings, and Goulsby said he didn’t recall.
In closing, the prosecutor argued that Goulsby was lying. Goulsby was Tatum’s ‘“buddy,” and ‘“he’s here to help [Tatum], not hurt [Tatum].” ‘“[Y]ou *1130 have a false alibi, where . . . Goulsby just is not a credible person.” ‘“[Ijt’s easy to get up, take an oath, and help out a friend. Very easy. It’s very easy to do that.” The defense argued that Goulsby had a chip on his shoulder because he had been subpoenaed and had to miss work, and his testimony was credible. In rebuttal, the prosecutor argued that Tatum subpoenaed only Goulsby rather than other workers because ‘“[i]n this case there’s only one person willing to lie, and that was . . . Goulsby.”
After the trial, the court repeated the instructions on witness credibility and the jury’s duty to disregard the court’s statements about the facts and the witnesses.
2. Analysis
Tatum complains that the court denied him due process and a fair trial when it made comments about plumbers and erred when it denied Tatum’s motion for a mistrial after being apprised of the fact that Tatum’s alibi witness was a plumber. In Tatum’s view, the trial court’s comments usurped the jury’s function to determine the credibility of the witnesses. We agree.
‘“Denial of a motion for a mistrial is reviewed for abuse of discretion and should be granted ‘only when “ ‘a party’s chances of receiving a fair trial have been irreparably damaged.’ ” ’ ” (People v. Panah (2005) 35 Cal.4th 395, 444 [25 Cal.Rptr.3d 672, 107 P.3d 790].) “ ‘ ‘‘A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.” ’ ” (People v. Lucero (2000) 23 Cal.4th 692, 713-714 [97 Cal.Rptr.2d 871, 3 P.3d 248].)
‘“A California trial court may comment on the evidence, including the credibility of witnesses, so long as its remarks are accurate, temperate, and ‘scrupulously fair.’ [Citation.] Of course, the court may not express its views on the ultimate issue of guilt or innocence or otherwise ‘usurp the jury’s exclusive function as the arbiter of questions of fact and the credibility of witnesses’. [Citation.] The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made.” (People v. Melton (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741].) ‘“The danger of judicial comment is that the jury is likely to place too much reliance on the judge’s opinion of how to resolve a factual issue.” “ ‘[T]he members of the jury are apt to give great weight to any hint from the judge as to his opinion on the weight of the evidence or the credibility of the witnesses ‘[J]urors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge’s last word is apt *1131 to be the decisive word.’ ” (People v. Cook (1983) 33 Cal.3d 400, 407-408 [189 Cal.Rptr. 159, 658 P.2d 86], overruled on other grounds in People v. Rodriguez (1986) 42 Cal.3d 730, 770 [230 Cal.Rptr. 667, 726 P.2d 113].)
In this unusual case, the trial court made extended remarks to prospective jurors, including six of those eventually empanelled, that she had had “horrible experiences with plumbers,” and “if I hear somebody is coming in, and I hear he’s a plumber, I’m thinking, ‘God, he’s not going to be telling the truth.’ ” The defense alibi witness, Goulsby, was a plumbing contractor. Goulsby testified that Tatum was working for him on a plumbing jobsite the entire day on the date Tatum was alleged to have shot Lowe and Valentine.[3] If the jury believed Goulsby, Tatum was not guilty. But six members of the jury had heard the trial court advise them that the court herself would not believe a plumber who testified. Goulsby’s credibility was a central issue. The prosecutor directly challenged Goulsby’s credibility on cross-examination, asking why he had not told a detective that Tatum was working for him on the day of the shooting. The prosecutor argued forcefully in closing that Goulsby was not credible and was lying to help his friend. The court’s statement that plumbers who came into court were liars validated the prosecutor’s argument, irreparably damaging Tatum’s chance of receiving a fair trial. The comment by the court expressed the court’s view on the credibility of Tatum’s alibi in a trial where Tatum’s alibi was his only defense. When, as here, the trial court comments on the credibility of defense witnesses, this “allows the jurors to discredit and disbelieve such witnesses without determining the question of credibility in accordance with proper instructions.” (People v. Oliver (1975) 46 Cal.App.3d 747, 753 [120 Cal.Rptr. 368].) As a result, “the jury did not function as the sole and exclusive arbiter of the credibility of the prosecution witnesses and the guilt or innocence of [Tatum], The trial court’s remarks exceeded the scope of proper judicial comment permitted by section 10 of article VI [of the California Constitution], and interfered with [Tatum] ’s constitutional right to a jury trial. [Citation.] Reversal of [Tatum]’s conviction is, therefore, mandatory.” (People v. Cook, supra, 33 Cal.3d at p. 412.)
The court abused its discretion when it denied the motion for a mistrial. This is especially true as defense counsel moved for a mistrial on the first day of voir dire, when granting a mistrial or dismissing the jury panel would not have caused undue delay. No admonition or instruction could have cured the prejudice that resulted from the trial court’s statement that it believed a plumber would lie in court, when Tatum’s alibi witness was a plumber who the prosecution argued came to court to lie for his friend. Under these circumstances an instruction would have been as ineffectual as the famous *1132 words spoken by the Wizard of Oz, “Pay no attention to that man behind the curtain!” (The Wizard of Oz (Metro-Goldwyn-Mayer 1939).)
DISPOSITION
The judgment is reversed.
Chaney, J., concurred.

 All further statutory references are to the Penal Code unless otherwise indicated.

 According to Tatum’s counsel, six of the jurors empanelled in the case heal'd the court’s remarks about plumbers.

 The prejudice caused by the anti-plumber remarks could also affect Tatum, who worked on plumbing jobs for Goulsby.