Filed 12/29/21  P. v. Carcamo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE CARCAMO,<br><br>    Defendant and<br>    Appellant. | B307609<br><br>(Los Angeles County<br>Super. Ct. No. NA108328) |

APPEAL from a judgment of the Superior Court of Los Angeles County,  Judith Levey Meyer, Judge.  Affirmed in part and modified in part with directions.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Jorge Carcamo of sexually abusing S.F. when she was a minor. Appellant contends his convictions must be overturned because the trial court repeatedly disparaged and undermined him, his counsel, and his theory of defense prior to and during his trial. He further asserts the trial court deprived him of an interpreter and improperly denied him the opportunity to call two crucial witnesses. Appellant forfeited these arguments by failing to object on judicial misconduct grounds below. Even if he had not, we conclude no intemperate judicial conduct occurred. We also reject appellant's contentions that the trial court imposed an unauthorized sentence and fees. We agree with appellant and respondent Attorney General, however, that the sentencing minute order and abstract of judgment contain errors. We accordingly order the sentencing minute order and abstract of judgment modified as stated herein. Appellant's convictions and sentence are otherwise affirmed in full.

## PROCEDURAL HISTORY

A second amended information filed July 24, 2019 charged appellant with seven counts[1] of sexual abuse: six counts of committing a lewd act upon a child, S.F., subd. (a)),[2] and one count of oral copulation or sexual penetration of S.F., a child 10 years old or younger (§ 288.7, subd. (b)). As to two of the lewd act counts, it was alleged that appellant had substantial sexual contact with S.F., who was under the age of 14 at the time

[1] In the second amended information, the charges were numbered two through eight. At trial, they were renumbered one through seven.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

(§ 1203.066, subd. (a)(8)).

The matter was tried to a jury in January 2020. At the conclusion of the prosecution's case in chief, it moved to dismiss the section 1203.066, subdivision (a) allegation. The defense did not object to this request, which the court granted.

The jury found appellant guilty of sexual penetration of a child 10 years old or younger, as well as five of the six lewd act counts.[3] After denying appellant's motion for a new trial, the trial court sentenced appellant to the mandatory term of 15 years to life on the sexual penetration count. It sentenced appellant to a consecutive midterm of six years on the first lewd act count, and consecutive terms of 1/3 the midterm (two years) on three of the others. On the final lewd act count, which involved leg and vaginal rubbing that occurred immediately prior to the digital penetration, the court sentenced appellant to a two-year concurrent term, because "there were separate acts in a single course of conduct." Appellant's total sentence accordingly was 12 years plus 15 years to life. The trial court imposed a restitution fine of $1,000 (§ 1202.4, subd. (b)), a court operations assessment of $240 (§ 1465.8, subd. (a)(1)), and a court facilities assessment of $180 (Gov. Code, § 70373, subd. (a)(1)).

Appellant timely appealed.

## FACTUAL BACKGROUND

### I.     Prosecution Evidence

S.F. testified that she was born in 2000 and was 19 at the time of trial. When S.F. was about six or seven, her parents began taking her to work with them during the summers; they

---

[3] The lewd act count of which appellant was acquitted was pled in the alternative to the count alleging sexual penetration of a minor 10 years old or younger.

3

both worked at a trucking company that was owned and operated by her father's family. Most of the workers there were members of S.F.'s extended family; appellant was one of the few who was not related to S.F. According to S.F., appellant worked in one of the trucking company's offices. S.F. estimated that appellant, a family friend, was 40 to 50 years old.

S.F. testified that there were two trailers or shipping containers in the trucking yard that served as offices. The larger trailer was divided into three rooms: an office used by S.F.'s grandfather; an office shared by S.F.'s uncle, appellant, and "whoever was working with him at that time"; and a "drivers' room" or "break room" used by the truck drivers. The smaller trailer contained two offices.

When S.F. was about seven or eight years old, she was coloring in her father's office when appellant walked in. He leaned behind her for what she thought was a hug, but then he moved his face toward hers and stuck his tongue in her mouth. S.F. did not understand what had happened and "just kept going on with [her] day" without telling anyone about the incident. She said she did not recall any further incidents that summer, but also stated that appellant kissed her a few times a week from that point forward. S.F. stated that the incidents occurred in various locations around the trucking yard, "anywhere where people couldn't see us or there was no cameras."

When S.F. was about eight or nine years old, appellant kissed her and rubbed her leg and inner thigh while she was in the drivers' room. He also slipped his finger into her shorts and touched the lips of her vagina, but stopped when someone entered the room. On a different occasion, when S.F. was about nine or ten years old, she was checking container numbers

outside the drivers' room when appellant pulled her up against a yellow forklift and began kissing her and touching her body. Appellant pulled her shorts aside and attempted to insert his penis into her vagina; he stopped after S.F. began "moving a lot." S.F. and appellant then continued to check the container numbers, and appellant told her, "you know what we're doing is wrong." Appellant always spoke to S.F. in English, because she did not speak Spanish.

The last incident between appellant and S.F. occurred when S.F. was 11 or 12 years old. S.F. and appellant were helping her uncle and cousin move some papers from one of the offices to a separate container on the property. While they were alone, appellant kissed her and put his hands on her breast. S.F. told appellant to stop, and he did. After that, S.F. stayed "more on guard" and watched appellant carefully, because she had younger siblings. She did not tell anyone what had happened, however, because she did not think they would believe her.

S.F. kept the information to herself until January 4, 2018, when it "unintentionally . . . came out" during an argument with her mother. S.F. disclosed the abuse to her father later that day. The following morning, she went to the police station; she spoke with various police officers and detectives over the next several weeks.

On or about January 22, 2018, at the request of Los Angeles Police Department (LAPD) detective Jon Kakita, S.F. called appellant on the phone and had a recorded conversation in English about the abuse (the "pretext call").[4] The recording was

---

[4] Kakita testified that a "pretext call" is "a recorded phone call where we attempt to have a victim call a suspect and ask

played for the jury and admitted into evidence. During the call, S.F. told appellant that she wanted answers about "some things that happened when I was little," like when "you kissed me." Appellant responded, "Yes, I'm sorry about it. You are still mad at me, right?" S.F. said she was not mad, but wondered why appellant had kissed her with his "tongue and stuff" when she was "so little." Appellant responded, "Yes, I, I know that. My bad, because I shouldn't do that. I shouldn't do that." S.F. said she was "only, like, eight," and appellant responded, "Yes, I know. I shouldn't do that, sorry about it." When S.F. pressed for an explanation, appellant said he "was crazy" and S.F. was "pretty" when she was eight, "but it doesn't mean that I, that I should do that. I know that, but I made a mistake." Appellant later said that he had thought that S.F. could be his girlfriend when she was older, even though this was "thinking stupid."

S.F. subsequently told appellant that she remembered him touching her "boobs and stuff," and she "didn't know like what was going on" at the time. Appellant responded, "I know, and I am sorry about it, because what I said like, I was, I was crazy." Appellant also agreed with S.F.'s statement that he put his hands in her pants when she was "like 10," said he remembered "having sex" with her when she was "like 10 or 11," and apologized for "hurt[ing]" S.F. He also reiterated that he "made a mistake" for which there was "no excuse." Appellant thanked S.F. when she told him she forgave him.

## II. Defense Evidence

Appellant testified, through a Spanish interpreter, that he worked at the trucking company from 2004 until his arrest in

_____

questions of why certain things happened. The point of the call is to get admissions or incriminating statements from the suspect."

6

2018. He primarily worked as a dispatcher, but also helped in the yard sometimes. He only spoke Spanish on the job.

Appellant testified that S.F.'s mother brought S.F. to the trucking company during the summers. S.F. sometimes came into the dispatch office where appellant worked to say hello to her uncles, whom she would greet with a kiss on the cheek. S.F. also greeted appellant in this manner. On one occasion, around 2011, appellant inadvertently kissed S.F. on the lips during their typical greeting. He did not stick his tongue in her mouth. When S.F. "practically" asked him to kiss her on the lips again, he "tried to explain to her that it was not good for [him] to do it." Appellant did not kiss S.F. on the lips again. He did, however, accidentally touch her breast during a greeting hug some time in 2011 or 2012. Appellant denied ever touching S.F. in a sexual way. He also testified that neither the drivers' room nor the yellow forklift S.F. identified as sites of abuse was present prior to 2012.

During the pretext call, appellant was distracted because he was cooking four different dishes, listening to the news on television, and drinking beer. He heard S.F. ask about a kiss, but did not hear her mention him putting his tongue in her mouth, placing his hands down her pants, or having sex with her. He also denied knowing the meaning of the English word "boobs." Appellant testified that during the call, he apologized, admitted making mistakes, and called himself crazy "so that [S.F.] wouldn't feel guilty of something because she was a child." He was specifically referring to the times he accidentally kissed her on the lips and touched her breast when greeting her. Appellant stated that he "really didn't know how to respond [to S.F.] in English" during the call.

Appellant was not "alarmed" or "afraid" during the pretext call and did not know why he was arrested at work the following day. Two LAPD officers, Kakita and Humberto Pitones, effectuated the arrest; Pitones spoke to appellant in Spanish. When appellant arrived at the police station, he asked Kakita to interview him in Spanish because he did not understand English. Kakita continued to speak to appellant in English. Appellant tried to understand and respond as best he could, but he did not "understand what [Kakita] was saying perfectly" or "correctly" and did not know why he had been detained. Appellant tried to communicate in Spanish with Pitones, who was also in the room, but Pitones "would just look at" appellant and did not answer him. Appellant believed Kakita was asking only about the greeting kiss, which he admitted. Appellant also admitted that his arm had inadvertently brushed against S.F.'s breast. He denied kissing S.F. with his tongue or digitally penetrating her vagina.

Kakita and LAPD officer Alma Skefich and Kakita testified about inconsistencies in S.F.'s allegations and in the reports they prepared. Kakita also testified that he visited the trucking company during his investigation but did not take any photographs, look for corroborating witnesses, or ask about what the facility looked like in 2008.

Kakita also testified that he assisted S.F. with the pretext call on January 22, 2018. The following day, January 23, 2018, he and Pitones, a Spanish-speaking officer, went to the trucking company to arrest appellant. Kakita testified that Pitones did not speak with appellant in Spanish. Pitones was present during Kakita's interview with appellant, which Kakita conducted in English for unspecified "various reasons." Appellant did not

8

appear to have any difficulty answering Kakita's questions. Kakita admitted, however, that appellant asked him what an "attorney" was, "there were instances where he would say short phrases in Spanish," and appellant occasionally spoke to Pitones in Spanish.

Appellant presented two witnesses, Jose Marquez and Sonia Aguilar, who worked at the trucking company from 2008 to 2012 and were familiar with its facilities. Marquez testified that the drivers' room did not exist prior to 2012, and the yellow forklift was not on the property until sometime in 2011 or 2012. He also testified that there were always "quite a few" people in the trucking yard and multiple drivers in the dispatch room. Marquez further testified that he never saw appellant leave the offices. Aguilar, Marquez's spouse, similarly testified that the drivers' room was created in 2011.

Appellant also presented several character witnesses, all of whom described him positively. Aguilar testified that appellant had a reputation as a "very honest" person of good moral character. Aguilar further testified that she never suspected appellant was sexually interested in her daughter, who was approximately 13 or 14 when appellant first visited her house. Aguilar's daughter, Jammie Salmeron testified that she first met appellant, now a family friend, about 10 years ago, when she was about 12 or 13. She testified that he had a reputation as "a good, honest, and helping person." He never tried to kiss her.

Estela Lobos testified that she lived next door to Aguilar, Marquez, and Salmeron. She interacted with appellant a few times a month, when he would visit her neighbors. She testified that he was "always very respectful to everyone" and she never suspected that he was interested in Salmeron or her own

9

daughter. Lobos's daughter, Kelly Lobos, who was 23 at the time of trial, testified that appellant was "very truthful," "always very respectful," and "very helpful, very sweet." Kelly "never got" from appellant that he had "the character trait for engaging in sexual deviant behavior."

## III. Prosecution Rebuttal

The prosecution re-called Kakita, who confirmed that he interviewed appellant in English, in the presence of officer Pitones. Appellant never asked Kakita to have Pitones translate what he was saying. The prosecution also played portions of the recorded interview, which were admitted into evidence. In the interview, Kakita asked appellant, "So when she was 8 years old, a child, did you kiss her?" Appellant responded, in English, "Yes, I'm not going to lie about it," and stated that he kissed S.F. "right here in the mouth." Appellant denied sticking his tongue in S.F.'s mouth. He admitted touching S.F.'s chest, which he called a mistake.

Officer Pitones testified that he and Kakita arrested appellant on January 23, 2018. When they arrived at the police station, Pitones "dialogu[ed] in Spanish" with appellant to "put him at ease." Pitones remained in the room during Kakita's interview of appellant, which was conducted in English. "Intermittently" during the interview, appellant addressed Pitones if he was confused about "a certain word." For instance, Pitones clarified for appellant that Kakita was not using the word "sex" to refer to "male or female." Pitones testified that appellant did not ask him to translate anything Kakita said.

10

**DISCUSSION**

**I.     Judicial Misconduct**

Appellant's primary argument is that the trial court engaged "in a pattern of conduct that denigrated defense counsel and undermined appellant's due process, his right to a fair trial with an impartial jury, effective assistance of counsel, and the right to a complete defense."  Appellant contends the trial court acted inappropriately in five ways:  (1) by initially denying (though ultimately granting) defense counsel's request to continue trial; (2) by stating that appellant spoke "some English" during jury selection; (3) by ruling that appellant's recollection of the Kakita interview conducted in English could not be refreshed via Spanish translation; (4) by ruling that two defense witnesses could not testify pursuant to Evidence Code section 352; and (5) by making "speaking commentary" that "undermined" defense counsel in front of the jury.  Appellant argues that these incidents, both individually and cumulatively, deprived him of a fair trial.

**A.     The misconduct claim is forfeited.**

Respondent contends that appellant has forfeited any claim of judicial misconduct by failing to object on that ground  at trial.  "As a general rule a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) Appellant, who did not object on judicial misconduct grounds at any point prior to or during trial, acknowledges that he "anticipated" this argument.  He replies that no objection was necessary because "the record . . . is overwhelmingly clear that it would have been futile to object by uttering the magic words, 'judicial misconduct.'"  Largely quoting *People v. Sturm* (2006) 37

11

Cal.4th 1218, 1237 (*Sturm*), he asserts, "Given the evident hostility by the judge toward defense counsel, it would have been unfair to require defense counsel to choose between repeatedly provoking the trial judge into making negative statements about defense counsel, appellant, or the case, or alternatively, giving up the client's ability to argue misconduct on appeal."

We agree with respondent that appellant has forfeited his judicial misconduct claim of error. Although appellant objected to some of the incidents he identifies as misconduct, he did not do so on misconduct grounds. Furthermore, the record does not support his assertion that such objection would be futile. The trial court was receptive to appellant's objections in at least two of the five alleged instances of misconduct: it granted appellant's request to continue trial, even after jury selection had begun, and it issued a curative instruction, with input from counsel, after its comment that appellant spoke "some English." The record as a whole does not evince "evident hostility between the trial judge and defense counsel" of the sort found to render objection futile in *Sturm*, *supra*, 37 Cal.4th at p. 1237, or a "trial atmosphere so poisonous [as to] thrust [defense counsel] upon the horns of a dilemma" analogous to that discussed in *People v. Hill* (1998) 17 Cal.4th 800, 821.

**B.     Even if considered, the misconduct claim lacks merit.**

Even if appellant had properly preserved his claim of judicial misconduct, we would reject it on the merits.[5]

---

[5] Because we conclude that appellant's claim of judicial misconduct would fail on the merits if preserved, we reject his alternative contention that defense counsel rendered ineffective

"We review claims of judicial misconduct on the basis of the entire record." (*People v. Peoples* (2016) 62 Cal.4th 718, 789.) "'[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78.) "'A "trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution." [Citations.] Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. [Citation.] When 'the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary.'" (*People v. Peoples*, *supra*, at pp. 789-790, quoting *Sturm, supra*, 37 Cal.4th at p. 1233.) Solitary or fleeting comments are insufficient to establish judicial misconduct, as are ambiguous remarks that may be understood by the jury as polite reminders to counsel. (See *People v. Seumanu, supra,* 61 Cal.4th at p. 1321.)

---

assistance by failing to preserve the issue for appeal. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [to establish ineffective assistance of counsel, an appellant must show both deficient performance by counsel and resultant prejudice].)

### 1.    *Continuances*

The first incident of alleged misconduct occurred before trial, when the trial court initially denied, but subsequently granted appellant's requests to continue the trial. At a pretrial conference in August 2019, defense counsel, who had been appointed to the case in April 2018, proposed a trial date of September 18, 2019. Defense counsel subsequently agreed to continue the trial date to December 4, 2019, but on that date requested another continuance for various reasons, including delays in another trial and her recent receipt of a new witness list from appellant. The court agreed to continue the trial to December 16, 2019, at which point defense counsel asserted that she "cannot be ready and provide effective representation for Mr. Carcamo by that day." After a colloquy during which counsel suggested the public defender's office was overworked, the court ruled counsel had had "ample opportunity to prepare for this case" and "deem[ed]" her ready by December 16. On December 16, defense counsel again asserted she was not ready. The court allowed counsel to make a record, then called in the prospective jurors to begin jury selection. After a full day of jury selection, defense counsel again raised the issue of her preparedness, citing her workload among other factors, and requested a continuance of one week. The court continued the trial to January 13, 2020, over the prosecution's objection.[6]

---

[6] It also issued an order to show cause as to whether the public defender's office should be removed from the case. The record does not contain further information on that matter, though we infer the public defender's office remained on the case because appointed counsel continued to represent appellant at trial.

14

While acknowledging that the decision whether to grant or deny a continuance is discretionary (see, e.g., *People v. Beames* (2007) 40 Cal.4th 907, 921), and that he in fact "eventually did obtain a continuance," appellant asserts the court was unreasonable, impatient, and denigrating to counsel before granting the continuance. He contends the trial court "undermined defense counsel's integrity and her preparedness and her ability to present an effective defense and did so in front of her own client," and claims this "presented a harbinger of what was to come" during the trial. Our review of the record reveals no abuse of discretion or misconduct by the trial court. Appellant received two requested continuances. To the extent the court may have been impatient or frustrated, and expressed those feelings, such isolated comments do not demonstrate misconduct or bias. (*People v. Nieves* (2021) 11 Cal.5th 404, 482-483.)

### 2. *Appellant's ability to speak English*

Appellant next contends the trial court "undermined and tainted appellant's defense at the inception of the case" by telling the jury panel that appellant "speak[s] some English." Specifically, when introducing the parties and other people the jury would see in the courtroom, the court stated, "So, ladies and gentlemen, you can see Mr. Carcamo Privado is using the assistance of a Spanish interpreter. Just so you know, I've met Mr. Carcamo before. He does speak some English, but when it comes to an important hearing such as this - - . . . [i]t's just important that someone speak 100 percent of the language. That's all. That they understand 100 percent of what's going on. . . . Even if that person might speak some English, we make sure that they understand 100 percent of what's going on in a courtroom . . . . We want to make sure that everybody in the

courtroom understands 100 percent of everything that's spoken in court. That's all. Okay. So please do not read anything into this or have any sort of opinion whatsoever just because he might be using the services of the Spanish interpreter. It's actually required by the court and the court actually insists that he use the services of the Spanish interpreter. Okay. So don't consider that in any way."

Defense counsel requested a sidebar during these remarks, which the court granted at their conclusion. At sidebar, defense counsel asserted that appellant "speaks very, very, very little English," and that the amount of English he speaks was "[o]ne of the main issues in the trial." She requested "the venire be excused and we start over." The court denied the request. Counsel then asked, "Are you going to fix what you said in any way?" The court said, "No. Thank you," and resumed its remarks to the jury. During those remarks, the court informed the jury that "words here from the bench are not evidence."

Once the potential jurors were excused, the prosecutor "supplement[ed]" the earlier sidebar by pointing out that appellant was heard speaking English in the recordings of the pretext call and the nearly two-hour interview with Kakita. He asserted that appellant's fluency "will, obviously, be up for debate in front of the jury." The court thanked the prosecutor and reiterated that it had "tried to make it clear that even things that come out of my mouth is [*sic*] not evidence with lots of examples." It also told defense counsel, "I appreciate your earlier motion [to excuse the venire]. I can see why you would make that earlier motion. I have zero issue with that earlier motion, but based on the way the court describes evidence in the case and that you even said that this is a particular question as to evidence I think

16

the court made it exceptionally clear that they will get evidence." In response to defense counsel asking where the court received the information that appellant spoke some English and some Spanish, the court clarified that its statement had been based on its interactions with appellant in court. Defense counsel then requested a transcript of the court's earlier remarks, which she asserted were "very beneficial to the People and very prejudicial to Mr. Carcamo Privado," and requested a mistrial. The court ordered the transcripts but denied the request for mistrial. It also invited the parties to think about a potential curative instruction during the lunch break.

The court and counsel resumed discussion of the issue after lunch. Defense counsel asserted that the court's remarks "direct[ed] a verdict as to whether my client speaks some English, [and] also affected his credibility." She also called the court's attention to *People v. Tatum* (2016) 4 Cal.App.5th 1125 (*Tatum*), in which the appellate court held a trial court erred in denying a mistrial after it made derogatory remarks about the credibility of plumbers when one of the main alibi witnesses in the case happened to be a plumber. The trial court concluded *Tatum* was distinguishable, but told the parties it would provide a curative instruction. After taking input from the parties, the court told the prospective jurors, "Ladies and gentlemen, I mentioned earlier during the introduction of the parties that Mr. Carcamo is using the services of the Spanish interpreter and that he may speak some English. What amount of English Mr. Carcamo speaks and understands may be an issue in the case, so please do not take my comments earlier during the instructions as any evidence - - and I mean evidence that goes in the box. Okay. It's just not. Do not take it as any evidence as to what, if any,

amount of English Mr. Carcamo speaks or understands. It's just a number. Like I said, we're just glorified referees. What the judge says is not evidence."

As noted above, recordings of both the pretext call and appellant's interview with Kakita were played for the jury. S.F. testified that she and appellant always spoke to one another in English, while appellant testified that he did not understand English "perfectly". Both parties addressed appellant's English proficiency (or lack thereof) during their closing arguments.

Appellant contends the court erred when it "essentially told the jury that appellant may not have needed an interpreter at all," then "highlighted the error over defense objection by admonishing the jury that the court was no more than a referee— and what the court said wasn't evidence." He asserts "the entire case was about what appellant understood was being asked of him during the pretext call and during interrogation which of course dovetailed with his credibility because it was his word against that of S.F."

We reject appellant's claim of misconduct. The court's statement that appellant spoke "some English" was an accurate one. Appellant's recorded statements in the case demonstrated that he had some English proficiency, and appellant himself testified that he did not understand English *perfectly*, necessarily implying that he understood at least some amount. The parties both presented evidence concerning appellant's English proficiency, and argued the issue to the jury. To the extent the trial court's comment may have been ineloquently worded, the trial court corrected any problem by instructing the jury panel that its statements were not evidence and it should not consider

18

the court's remarks as evidence of the amount of English, if any, appellant spoke.

Neither the court's original comment nor its follow-up instruction directed a verdict, supported the prosecution's position, or suggested the court found appellant not credible. Unlike *Tatum*, *supra*, 4 Cal.App.5th 1125, in which the court categorically commented on the credibility of plumbers and stated that it would not believe any plumber who testified, the trial court here simply stated, accurately and neutrally, that appellant spoke "some English." It did not offer commentary on how much English appellant spoke or understood, nor did it convey any personal animus toward appellant, his witnesses, or their credibility. Moreover, the court explicitly told defense counsel that it "appreciated" and understood why she raised the arguments she made, allowed her to make a record of the issue, and ordered the transcripts of its ruling; no bias or contempt toward counsel or her client is apparent from the record.

### 3.    *Refreshing recollection*

Appellant next contends the court improperly deprived him of an interpreter during a portion of trial and "presumed" he spoke English well enough not to require an interpreter. After appellant stated several times during direct examination that he did not remember various portions of his interview with Kakita, defense counsel sought to refresh his recollection with a transcript of the interview. She asked that the interpreter read it to him in Spanish. At sidebar, the court stated that it appeared appellant was "playing games with this court" by saying "I don't speak English" and "I don't remember this interview." The court continued, "If he's stupid, well then so be it, but I'm not going to have the interpreter read him this transcript as a refreshing

19

recollection in Spanish when he understood perfectly well" when he was interviewed in English. The court said it would allow defense counsel to play a portion of the recorded interview to refresh appellant's recollection, or to read the transcript in English. Defense counsel responded, "That's perfectly fine." The court specifically stated that its remarks were not a "reflection on [defense counsel]."

When the parties returned from sidebar, the court told the jury, "So, ladies and gentlemen of the jury, there is a procedure called 'refreshing recollection. It's just reminding somebody, perhaps, of something said before, and in this case, perhaps how it was said before. . . . [Defense counsel] is going to try to refresh recollections with a document. I am actually ordering the interpreter to not interpret how [defense counsel] reads from that document because the [interview] was done with oral English and so I want oral English to be refreshed. So just let me know when you're starting and stopping so our interpreter will know when to stop translating."

Appellant also points to an earlier portion of trial, during S.F.'s testimony, when he advised the court that the interpreters "do not get everything that's being said." After excusing the jury, the court sought clarification: "Okay. So I'm a little confused right now. You're not supposed to be paying attention to the English questions. You're supposed to be speaking Spanish, and you're supposed to be listening to the interpreter interpreting the questions in Spanish and then interpreting the answer in Spanish. The way it was just conveyed to me now, is you're trying to understand the English question and then just listen to the Spanish answer. Am I misunderstanding what's going on, sir?" Before appellant could answer, defense counsel asked if S.F.

could leave the stand, which the court then ordered her to do. Appellant then told the court, "Yes. It's being interpreted badly." The court responded, "So you understand English?" Appellant said he did not, to which the court replied, "Well, clearly, you do if you're saying it's being interpreted badly." The court then asked appellant, "are you having difficulty understanding, maybe, the dialect, or is it just being spoken so fast? Because I really don't know what else to do to assist right now." Appellant stated that he was "not interpreting from the English," and explained that the interpreter had not interpreted one of S.F.'s answers. The court said, "Okay. So it was just one incident where we missed an answer. That's what's going on," and appellant replied, "Correct." The court then repeated the relevant answer, and said, "Very good. Simple issue. We will work to make sure the question and answer are all interpreted."

Appellant asserts these incidents "demonstrate how quickly the court was to judge appellant by jumping to the conclusion that he understood English." He further contends the court's refusal to allow the Spanish interpreter to translate the English transcript for appellant "was completely improper and an abuse of discretion if not outright animus toward appellant," who "has the right to have an interpreter present during every aspect of a criminal trial." He emphasizes that his defense "was that he didn't understand a great deal of English," and suggests the alleged misconduct undermined that defense. He does not, however, demonstrate judicial misconduct.

As respondent points out, and appellant acknowledges in reply, defense counsel made no objection to the court's ruling on refreshing recollection. To the contrary, she responded, "[t]hat's perfectly fine." Appellant contends this is because "it would have

21

been futile for counsel to object and further incur the court's ire toward appellant," but there is no indication, even in these two exchanges, that the trial court harbored "ire" toward appellant or defense counsel that would render objection futile. In fact, the court took steps to clarify the nature of appellant's issue with the interpreter, and gave defense counsel the option to refresh appellant's recollection by playing the audio recording of the interview.

Appellant's reliance on *People v. Aguilar* (1985) 35 Cal.3d 785, is misplaced. There, the trial court erred by "borrowing" the defendant's interpreter for use by other witnesses and the court, leaving him without the interpreter's services throughout significant portions of the trial. Here, the court ensured that appellant had the interpreter's assistance throughout the trial, with the exception of this single instance of refreshing recollection, to which his counsel acquiesced. Similarly distinguishable is *United States v. Mayans* (9th Cir. 1994) 17 F.3d 1174, 1177-1178, in which the trial court erred by requiring the defendant to testify in English after he stated through the interpreter that he spoke English. The court also made improper comments, stating that the defendant "had been in this country longer than he had been in Cuba," and that testimony takes "twice as long" with an interpreter. The defendant's counsel objected, then withdrew defendant as a witness. Here, the court allowed appellant to testify through his interpreter. It did not, as appellant asserts, "forc[e] counsel to conduct a portion of her direct examination of appellant in English." Rather, the court required appellant to listen to his own prior English statements as he had uttered them, in English, to refresh his recollection,

22

with the agreement of defense counsel. This did not constitute judicial misconduct.

Appellant also repeatedly emphasizes that S.F. remained on the stand during the court's initial attempt to clarify why appellant was unable to understand the interpreter, and that defense counsel had to request that she be excused. He does not, however, indicate how this contributed to the alleged judicial misconduct. We do not see the relevance. Prior to the exchange with the court, S.F. testified that appellant understood and spoke to her in English. There is no suggestion in the record that S.F.'s testimony was influenced in any way, and appellant's colloquy with the court took place outside the presence of the jury.

### 4. *Exclusion of witnesses*

During the defense case, defense counsel advised the court that she had served a subpoena on Philip Robinson, a former employee of the trucking company, earlier in the day. She stated that she intended to ask Robinson only about "what the configuration of the offices were in 2008." Later, after Marquez and Aguilar both testified at length about the configuration of the offices, defense counsel proffered Robinson, who was not on the witness list, as a witness. The court asked what the purpose of calling Robinson would be, and defense counsel reiterated that she just wanted to "show[ ] him four pictures and ask[ ] him if this is the way [the trucking yard] looked in 2008." The court denied the request as cumulative under Evidence Code section 352. After the court ruled, defense counsel argued that Robinson was an "important" witness because, unlike Marquez and

23

Aguilar, he was "not a friend to my client."[7] The court stated, "Counsel, I've ruled, and you've made your record. I'm not going to go back and forth on this with you."

The court also rejected as cumulative appellant's request to call Arturo Lobos, the husband of Estela Lobos and father of Kelly Lobos, as a character witness. The court made this ruling after counsel stated that Arturo's testimony would not differ materially from Estela's. After a brief recess, defense counsel again raised the issue of Arturo Lobos at sidebar, advising the court that Arturo was "the one who knows my client the best," and therefore "has the most [*sic*] information about the character than the other two." The court thanked counsel for the additional information and said it was "standing by its ruling."

During rebuttal argument, the prosecutor urged the jury to discount the testimony of appellant's "character witnesses," all of whom "treat him like family" and thus "have an implicit bias about him." Defense counsel objected on the grounds of prosecutorial misconduct. The court asked if she wished to be heard, and counsel said she would make her record when the argument was concluded. Counsel subsequently clarified that the basis of her objection was that the prosecutor "didn't have a good faith believe [*sic*] that we didn't have witnesses to present" who were not friends with appellant, namely the excluded Philip Robinson. The prosecutor responded that "the record will stand for itself," and the court thanked counsel.

---

[7] Appellant seemingly undercuts this assertion in his opening brief, stating in a footnote that Robinson was "another dispatcher who only spoke English" and appellant "would joke around with him using sign language."

Appellant now contends "the record does speak for itself," and "favors the defense," because the trial court "once again interfered with a critical aspect of appellant's defense by excluding the evidence" and the prosecutor committed misconduct by "sandbagging" and "us[ing] a court ruling to the State's advantage."

A trial court's evidentiary rulings against a party, even if erroneous, "'do not establish a charge of judicial bias, especially when they are subject to review.'" (*People v. Farley* (2009) 46 Cal.4th 1053, 1110.) Appellant does not argue under a separate argument heading that these rulings were erroneous, though he contends the rulings were incorrect because they were based on the "implied assumption" that he "could not rely on the proffered evidence of individuals who knew him more intimately than Kelly or Estela Lobos." The record does not support this theory. The court directly asked counsel if Arturo's testimony would differ materially from that of the other character witnesses, and she said it would not. The court acted well within its discretion by prohibiting appellant from presenting admittedly cumulative evidence. (See Evid. Code, § 352; *People v. Miles* (2020) 9 Cal.5th 513, 587.)

With respect to Robinson, appellant asserts that Robinson "could testify to appellant's acumen for the English language by virtue of his *daily interaction with appellant*." However, when the court asked counsel for a proffer on Robinson, she stated only that he would testify about the layout of the offices in 2008. The trial court could not have abused its discretion or committed judicial misconduct by failing to permit a witness to testify about a topic which was not brought to its attention. Appellant also asserts, without citation to authority, that the prosecutor's

25

rebuttal argument about Robinson was "done in bad faith." This is an inaccurate characterization of the prosecutor's argument, which referred only to the putative biases of appellant's "character witnesses." Robinson was proffered as a limited percipient witness, not a character witness. Neither judicial nor prosecutorial misconduct occurred.

### 5. *Speaking commentary*

Finally, appellant contends the court undermined defense counsel by making "persistent, discourteous, and/or improper commentary" about defense counsel's courtroom performance, "contaminat[ing] material aspects of the defense case." He first points to comments the court made during S.F.'s testimony, when it asked defense counsel to clarify which page of the pretext call transcript she was referring to, and when it told counsel that appellant's assertions that he was crazy "over and over again" were "in a different interview." Next, he points to the direct examination of Aguilar, during which the court asked defense counsel why she was going to publish an exhibit Aguilar said she did not recognize. He also notes that defense counsel asked permission to ask Aguilar a final question after she had already left the stand, which the court evidently denied during an unreported sidebar.

Finally, appellant points to exchanges during defense counsel's questioning of Kakita. The prosecutor objected to a question concerning Kakita's reasons for conducting the interview in English on the grounds of relevance and "calls for a conclusion." The court stated the objection was sustained. Defense counsel asked, "On what grounds?", and the court explained, "What's going through his state of mind doesn't matter. It's what the jury ultimately concludes. The amount of

26

English your client speaks, based on – they have a pretext call, and they just heard this. So what he's thinking is . . . he's not the trier of fact. The jury is." Later, the trial court asked counsel if she had previously read aloud an excerpt of a transcript, and then said that the precise number of employees on the yard was "a collateral issue, unless you want to approach and explain to me the ultimate relevance." Outside the presence of the jury, the court ruled that "impeaching [S.F.] on this one point in the yard has already been established for days now, so I'm ruling, under 352, enough with this." Defense counsel asked the court if it was "not allowing [her] to respond to what was asked on cross and redirect," and it said, "That's correct." The court also denied defense counsel's request to reopen after the prosecutor concluded his recross-examination of Kakita.

Appellant contends these "speaking comments" by the court constituted misconduct. We disagree. The trial court has a duty to control the conduct of the trial, and is vested with the discretion to rebuke attorneys if they ask inappropriate questions, disobey the court's instructions, or otherwise engage in improper or dilatory behavior. (*People v. Woodruff* (2018) 5 Cal.5th 697, 770.) "[C]orrect rulings occasionally accompanied by impatience" do not rise to the level of judicial misconduct. (*Id.* at p. 768.) The trial court's remarks during S.F.'s and Aguilar's testimony, and its cessation of the inquiry into the number of people at the trucking company, were proper, if perhaps impatient, exercises of its duty to control the conduct of the trial, as were its restrictions on asking additional questions of witnesses who had already been excused. The court's explanation of its evidentiary ruling during Kakita's testimony was a direct response to a question from defense counsel. It was

27

not, as appellant suggests, an implication to the jury that defense counsel was deliberately asking improper questions to place inadmissible evidence before the jury. (*People v. Nieves, supra*, 11 Cal.5th 404, 485.) In the context of the entire trial, the court's remarks, separately and collectively, do not demonstrate judicial misconduct.

## II. Sentence

The court sentenced appellant to consecutive terms on all but one count of committing a lewd act upon a child. The court sentenced appellant concurrently on the count involving the rubbing of S.F.'s leg and vaginal area, which the prosecution alleged happened immediately prior to appellant's digital penetration of S.F.'s vagina. The court was required to sentence appellant to a term of 15 years to life for the digital penetration, which the jury found occurred when S.F. was 10 years of age or younger. (See § 288.7, subd. (b).) The trial court explained, as to the rubbing count and digital penetration count, "Technically it is not a 654 issue, meaning they are separate acts. The court has the authority to run [sentence on the rubbing count] consecutive. I'm choosing to exercise my discretion because . . . there were separate acts in a single course of conduct. Separate acts would justify consecutive sentencing, but the court is exercising discretion to give it concurrent sentencing."

Appellant now contends this sentence was unauthorized. He asserts that the sentence on the lewd act count should have been stayed under section 654, because the act of rubbing S.F.'s leg and vaginal area was "committed for the purpose of facilitating and therefore incidental to the remaining sexual offense of digital penetration." Respondent responds that appellant "could have placed his hand under S.F.'s shorts and

28

digitally penetrated her vagina without any . . . external rubbing, [so] those preparatory acts were not incidental to, nor the means by which appellant subsequently penetrated S.F. As such, the court properly punished him for both criminal offenses." We agree with respondent.

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest term of potential imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute ensures a defendant is punished in accordance with his or her culpability by preventing him or her from being punished twice for two crimes arising from a single, indivisible course of conduct. (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514 (*Hicks*).) Whether a course of conduct is divisible and consequently gives rise to multiple acts within the meaning of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the offenses. (*Ibid.*) "In cases involving sex offenses, courts have found that '[e]ven where the defendant has but one objective—sexual gratification— section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished. [Citations.] [Citations.] [¶] Section 654 does not apply to sexual misconduct that is 'preparatory' in the general sense that it is designed to sexually arouse the perpetrator or the victim. [Citation.]' [Citation.]" (*Ibid.*) This approach ensures that a "clever molester" cannot "violate his [or her] victim in numerous lewd ways, safe in the knowledge that he [or she] could not be convicted and punished for every act." (*People v. Scott* (1994) 9 Cal.4th 331, 347.) We review the trial court's factual

29

determinations regarding a defendant's intent and the "preparatory" nature of sexual misconduct for substantial evidence. (*Hicks*, *supra*, 17 Cal.App.5th at p. 515.) In doing so, we consider the evidence in the light most favorable to the judgment. (*Ibid.*)

Here, the court expressly found that the rubbing and penetration were separate acts. Indeed, as respondent observes, appellant need not have rubbed S.F. before digitally penetrating her. Although the rubbing preceded the penetration, the court's implicit finding that it constituted preparatory conduct intended to arouse either or both appellant and S.F. was supported by S.F.'s testimony. The court's imposition of sentence for the rubbing did not violate section 654. (See *People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006-1007 [kissing and digital penetration occurring shortly thereafter were separate acts].)

## III. Imposition of Fines and Fees

The trial court imposed on appellant a restitution fine of $1,000 (§ 1202.4, subd. (b)), a court operations assessment of $240 (§ 1465.8, subd. (a)(1)), and a court facilities assessment of $180 (Gov. Code, § 70373, subd. (a)(1)). Appellant raised no objection to the fines or fees and did not invoke *People v Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). The court nevertheless observed that the restitution fine exceeded the minimum, and found that "in state prison they have the ability to work," and that appellant's prison term of 27 years to life would give him sufficient time to "earn that in prison wages." The court further stated, "If for some reason [appellant] becomes disabled at state prison and cannot earn some type of prison wage, then the court absolutely will review this order and consider not only reducing it

to the $300 minimum mandatory but on top of that staying it entirely."

Appellant now contends the court erred under *Dueñas* by failing to hold an ability to pay hearing before imposing fines and fees. In *Dueñas*, Division Seven of this court held that "due process of law requires a trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" certain fines and fees. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) Respondent asserts that appellant forfeited the issue by failing to object to the imposition of the fine and fees in the trial court. We agree.

The *Dueñas* opinion was issued on January 8, 2019. Appellant was sentenced more than 18 months later, in July 2020, but he did not object on *Dueñas* grounds. Appellant argues that his contention has not been forfeited, because under *Dueñas*, the government must prove a defendant has the ability to pay before the court may impose fines or fees. *Dueñas* does not so hold. Division Seven, which decided *Dueñas*, has stated, "Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed. . . ." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*), ["It is the defendant who bears the burden of proving an inability to pay"], rev. granted Nov. 13, 2019, S257844.)[8] Appellant's failure to object on the basis of *Dueñas* forfeited his challenge.

---

[8] In *Kopp*, the Supreme Court will consider two issues: "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? (2) If so, which party

31

Even before *Dueñas*, defendants had a statutory right to challenge the imposition of a restitution fine exceeding the statutory minimum of $300. Under section 1202.4, a defendant's inability to pay "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $ 300]." (§ 1202.4, subd. (c).) Here, the court imposed a $1,000 restitution fine, well in excess of the $300 minimum, and appellant did not object on the basis that he was unable to pay the fine or that he was entitled to present evidence on his ability to pay. Appellant likewise did not contest the court's finding that he had the ability to earn sufficient wages during his incarceration to pay the fine. "Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154, citing *People v. Avila* (2009) 46 Cal.4th 680, 729.) His failure to do so results in the forfeiture of his appellate challenge.

Moreover, because appellant did not object to the $1,000 restitution fine based on his inability to pay it, "he surely would not complain on similar grounds regarding an additional [$420] in fees." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Even if appellant had objected, an objection would not have been well taken, as ability to pay is not synonymous with cash on hand. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076.) The trial court is permitted to consider a defendant's ability to pay in the future, including his or her ability to earn prison wages. (*Ibid.*) Even at the low end of approximately $12 per month, appellant's prison term of 27 years to life will give him ample

bears the burden of proof regarding the defendant's inability to pay?"

time to earn enough to pay the assessed fines and fees. (See *ibid.*) Any error in the court's failure to provide him an ability to pay hearing accordingly is harmless.

Appellant contends in the alternative that the $1,000 restitution fine is an unconstitutionally excessive punitive sanction, and that defense counsel was ineffective in failing to preserve both this and his *Dueñas* argument. We reject these contentions in light of our conclusion that any error in the imposition of the fines and fees was harmless.

## IV. Errors in Sentencing Minute Order and Abstract

Appellant contends, and respondent agrees, that the minute order documenting appellant's sentencing hearing and the abstract of judgment issued thereafter contain errors. Specifically, the minute order reflects that appellant was convicted on count four and acquitted on count five, when he was in fact acquitted on count four and found guilty on count five. The abstract of judgment is incorrect in that it does not reflect the renumbering of the counts and incorrectly reflects that the sentence on count four (renumbered as count three) was imposed and stayed. We agree with the parties that these documents are in error.

Where there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment or minute order, the oral pronouncement controls, and we may order correction of any such errors. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We do so here. We order the minute order modified to reflect that appellant was found not guilty of count four and guilty of count five. We order the abstract of judgment to reflect that appellant was sentenced to an indeterminate term of 15 years to life on count seven, and the following determinate

33

terms:  six years consecutive on count one, two years consecutive on count two, two years concurrent on count three, two years consecutive on count five, and two years consecutive on count six.

## DISPOSITION

We modify the abstract of judgment to reflect that appellant was sentenced to an indeterminate term of 15 years to life on count seven, and the following determinate terms:  six years consecutive on count one, two years consecutive on count two, two years concurrent on count three, two years consecutive on count five, and two years consecutive on count six.  We further modify the sentencing minute order to reflect that appellant was acquitted on count four and found guilty on count five.  The judgment of the trial court is affirmed in all other respects.  The trial court is directed to prepare an amended minute order and abstract of judgment and forward a certified copy to the California Department of Corrections and Rehabilitation.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J.

34